DECISION AND JOURNAL ENTRY
This cause was heard upon the record in the trial court. Each error assigned has been reviewed and the following disposition is made:
 {¶ 1} Plaintiff-Appellant Ronald Maxwell ("Father") appeals from the judgment of the Wayne County Court of Common Pleas that denied his motions to modify custody and insurance obligations. This Court affirms.
 I {¶ 2} Father and Defendant-Appellee Cindy Schleigh ("Mother") were married briefly in 1998. A child, T.M., was conceived during the marriage. Prior to T.M.'s birth on November 8, 1998, Father filed for divorce. In May 1999, the parties were granted a divorce. Mother was named T.M.'s residential parent and *Page 2 
Father was granted three three-hour visitation periods per week. Within a few weeks of that order, the parties voluntarily altered Father's schedule to permit longer visitation on weekends.
 {¶ 3} The events leading up the instant court action began in August of 2004. In the parties' divorce decree, the child's last name was to be changed to Father's last name. Neither party, however, acted to change the name until just prior to T.M.'s enrollment in kindergarten. According to Mother, T.M. did not respond well to seeing a different last name on his desk in kindergarten. As a result, she moved in the trial court to restore T.M.'s last name. Around this same time, Mother began taking T.M. to Dr. Eve Whitmore. Mother indicated that T.M. was not sleeping well and was having problems adjusting to increased visitation with Father. In October of 2004, Father moved to change custody and modify his health insurance obligation. With Father's motions pending and based upon Dr. Whitmore's recommendation, the trial court suspended Father's visitation rights in November of 2004. As a result, during this litigation Father had only supervised visits with T.M.
 {¶ 4} A three-day hearing was held on Father's motions before a magistrate. On October 5, 2005, the magistrate issued his ruling recommending that Father's motions be denied. The same day, the trial court journalized its ruling denying Father's motions. On October 20, 2005, Father objected to the magistrate's decision. A transcript of the hearing was produced on May 16, 2006, *Page 3 
and Father supplemented his objections on January 1, 2007. On May 16, 2007, the trial court overruled Father's objections and adhered to its prior decision. Father timely appealed the trial court's judgment, raising two assignments of error for review.
 II Assignment of Error Number One "THE TRIAL COURT'S FINDINGS THAT IT WOULD NOT BE IN THE BEST INTEREST OF THE MINOR CHILD TO CHANGE CUSTODY AND THAT THE HARM CAUSED BY SUCH A CHANGE OF ENVIRONMENT WOULD BE OUTWEIGHED BY THE BENEFITS THERETO WERE AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE, AND THEREFORE THAT (sic) THE COURT ABUSED ITS DISCRETION WHEN IT FAILED TO ORDER THAT CUSTODY OF THE PARTIES' MINOR CHILD BE CHANGED FROM THE APPELLEE TO THE APPELLANT."
 {¶ 5} In his first assignment of error, Father asserts that the trial court erred when it denied his motion to modify custody. Specifically, Father alleges that it is in the child's best interest that he be granted custody. This Court disagrees.
 {¶ 6} A trial court has broad discretion in its determination regarding a modification of parental rights. Miller v. Miller (1988),37 Ohio St.3d 71, 74. Accordingly, an appellate court applies an abuse of discretion standard when reviewing a trial court's determination concerning a modification of parental rights. Masters v. Masters (1994),69 Ohio St.3d 83, 85. An abuse of discretion suggests more than an error of law or judgment. Blakemore v. Blakemore (1983), *Page 4 5 Ohio St.3d 217, 219. It implies that the attitude of the trial court was unreasonable, arbitrary, or unconscionable. Id. Moreover, this Court must affirm the factual conclusions of the trial court unless they are not supported by competent, credible evidence. Spinetti v. Spinetti
(Mar. 14, 2001), 9th Dist. No. 20113, at *4; see, also, State v.Wilson, 113 Ohio St.3d 382, 2007-Ohio-2202.
 {¶ 7} The trial court's discretion in determining parental rights is guided by the applicable statutory provisions. Miller,37 Ohio St.3d at 74. Specifically, modifying a prior custody decree is governed by R.C.3109.04(E), which states in pertinent part as follows:
 "(E)(1)(a) The court shall not modify a prior decree allocating parental rights and responsibilities for the care of children unless it finds, based on facts that have arisen since the prior decree * * * that a change has occurred in the circumstances of the child, [or] the child's residential parent * * *, and that the modification is necessary to serve the best interest of the child [and] * * *:
 "(iii) The harm likely to be caused by a change of environment is outweighed by the advantages of the change of environment to the child." R.C. 3109.04(E)(1)(a)(iii).
Applying the statutory language requires the trial court first to determine whether a change of circumstances of the child or residential parent has occurred since the prior court order. Wyss v. Wyss (1982),3 Ohio App.3d 412, 414. Following that determination, the trial court must utilize R.C. 3109.04(F)(1) and determine what is in the child's best interest.
 {¶ 8} R.C. 3109.04(F)(1) provides in pertinent part as follows: *Page 5 
 "In determining the best interest of a child pursuant to this section, * * * the court shall consider all relevant factors, including, but not limited to:
 "(a) The wishes of the child's parents regarding the child's care;
 "* * *
 "(c) The child's interaction and interrelationship with the child's parents, siblings, and any other person who may significantly affect the child's best interest;
 "(d) The child's adjustment to the child's home, school, and community;
 "(e) The mental and physical health of all persons involved in the situation;
 "(f) The parent more likely to honor and facilitate court-approved parenting time rights or visitation and companionship rights[.]"
Based upon the above framework, we review Father's claim of error.
 {¶ 9} Initially, we note that it is unclear from Father's brief which evidence he relies upon to demonstrate the required change in circumstances. However, assuming arguendo that Father demonstrated a change in circumstances, his assignment of error lacks merit.
 {¶ 10} Initially, we note that in his brief Father details the testimony of an employee of the city water department. The employee testified that when he was sent to turn the water off at the residence formerly rented by Mother, he refused. The employee indicated that the apartment had a strong smell of cat feces and urine and was so filthy that he would not work in it. However, Mother's testimony indicated that she had never owned a cat and had moved out of the *Page 6 
home several weeks before the water department employee entered the home. Furthermore, Mother testified that she was informed that the apartment had been broken into after she moved out. Consequently, Father presented no evidence that Mother's residence posed any risks to T.M.
 {¶ 11} On appeal, Father's focus appears to be on Mother's mental health. See R.C. 3109.04(F)(1)(e). Specifically, Father relies heavily upon the testimony of psychologist Dr. Marianne Bowden. After conducting clinical interviews and psychological testing of Mother, Father, and T.M., Dr. Bowden gave her professional opinion about their mental well-being. T.M. was diagnosed with an adjustment disorder with mixed traits of anxiety and depression. Dr. Bowden found that Father had no diagnosable mental disorder. On the other hand, Mother was diagnosed with a personality disorder not otherwise specified. Dr. Bowden indicated that Mother's diagnosis resulted from indications that Mother had strong narcissistic and histrionic traits. Dr. Bowden summarized these traits as Mother being overly dramatic and "faking good." Dr. Bowden also described Mother's relationship with T.M. as enmeshed or overly dependent. Based on her evaluation, Dr. Bowden recommended that Father be given custody.
 {¶ 12} On cross-examination, Dr. Bowden admitted that she had no current concerns over Mother's ability to parent T.M. Furthermore, Dr. Bowden conceded that the posture of the proceedings could have affected Mother's test results. For example, Dr. Bowden noted that given the history of unsubstantiated *Page 7 
allegations of abuse from Father, it was reasonable to conclude that Mother would be defensive in answering questions. This defensiveness, in turn, could contribute to the finding of narcissism. Apart from Dr. Bowden, no other medical opinions were given regarding the mental well-being of Father or Mother.
 {¶ 13} However, psychologist Dr. Eve Whitmore also testified. Dr. Whitmore testified that Mother contacted her to request counseling for T.M. as Mother believed he was having a difficult time adjusting to increased visitation with Father. According to Dr. Whitmore, Mother willingly permitted Father to become involved with the counseling. During the first session with all three individuals, Dr. Whitmore indicated that Mother actively encouraged T.M. to interact with Father and told T.M. that it was important to cooperate with Dr. Whitmore. Dr. Whitmore testified, however, that in later sessions T.M. clung to Mother and often refused to interact with Father.
 {¶ 14} In addition to both psychologists, the appointed guardian ad litem Dwaine Hemphill testified. Hemphill agreed with Dr. Bowden's assessment. Moreover, he expressed his concern that Mother had engaged in parental alienation. Specifically, Hemphill testified that there was no other reasonable explanation for the change in T.M.'s attitude between the first and second sessions with Dr. Whitmore. Hemphill also pointed out that the three fathers of Mother's other children were not involved in those children's lives, supporting his belief that Mother engaged in parental alienation. *Page 8 
 {¶ 15} The remaining evidence before the trial court was largely an issue of credibility. For example, Father and Mother agreed very little on what had happened in the past. Father testified that he had exercised overnight visits with T.M. consistently for several years prior to the motion to modify custody. In contrast, Mother testified that Father had never visited continuously with T.M. for 48 hours until shortly before the motion to modify custody was filed.
 {¶ 16} Father's testimony can be summarized as follows. He had in the past called the police and children's services to report abuse by Mother. None of these claims were substantiated. Father stopped reporting the abuse because he believed Mother had "tricked the system" and that his claims would no longer be investigated. In August of 2004, just before T.M. began kindergarten, Father legally changed the child's last name to his own. While the parties' divorce decree had provided for this result, neither party had taken any action to change the name until then. During his testimony, Father blamed Mother for failing to take action to change the name and for allowing T.M. to use her last name when enrolling in activities.
 {¶ 17} Like Father, Mother does not accept responsibility for failing to have T.M.'s name legally changed. She attributed fault in that matter to Father's inactions. Mother also testified that T.M. became distraught in his kindergarten class following Christmas break when he was required to write Father's last name. Mother testified that T.M. had only used Mother's last name and knew that his *Page 9 
three siblings each used that last name. Mother indicated that T.M. became so distraught over the name change that she withdrew him from school and home schooled him for the remainder of the year.
 {¶ 18} Mother also testified about the close bond that T.M. has with his older half-brother J.S. Mother indicated that the two were nearly inseparable, competing in many of the same sports. Moreover, Mother testified that J.S. looks out for T.M. and the two are constantly together. Mother also indicated that T.M. held a close bond with her eldest two children. This supports a finding that custody should remain with Mother. See R.C. 3109.04(F)(1)(c).
 {¶ 19} In support of her testimony, Mother offered the testimony of Lorain Brandenburg, David Richards, Kelly Wrobel, Rex Randolph, and Timothy Frontz. Each of these witnesses effectively labeled Mother as "Supermom." They indicated that Mother was always involved with each of her children. Each witness testified that Mother always put the needs of her children first and sacrificed daily for them. They indicated that Mother's children were always involved in numerous activities and that Mother also put the children's schedule first.
 {¶ 20} Based upon our review of the record, we cannot say that trial court erred when it determined that it was in T.M.'s best interest that Mother retain custody. Numerous witnesses portrayed Mother as a loving, caring woman. While Father has repeatedly accused Mother of abuse, his claims have gone *Page 10 
unsubstantiated. However, the fact that Father believes Mother has "tricked" everyone supports a finding that Father would be more likely to interfere with court-ordered visitation under his own belief that it is not in T.M.'s best interest. Furthermore, Mother has never interfered with Father's custody rights. Despite the lack of a court order for a significant period of time, Mother permitted Father to have extended weekend visitation. Mother also agreed to the standard visitation order the last time the parties were in court and actively sought counseling which included Father. These facts support a finding that Mother is more likely to honor and facilitate court-ordered visitation. See R.C.3109.04(F)(1)(f).
 {¶ 21} Finally, Hemphill, the guardian ad litem, admitted that his only concern related to Mother's alleged parental alienation. No evidence was submitted that supports a conclusion that Mother engaged in parental alienation. As noted above, Mother actively encouraged T.M. to interact with Father during counseling and voluntarily expanded Father's visitation periods. Additionally, Mother admitted that the three fathers of her other children were not involved in her life. One father, Frontz, testified that he chose not to be involved in his child's life because of problems in his personal life. The other two fathers both live out of state. Mother testified that these fathers also voluntarily chose not to be involved in their children's lives. No evidence was presented to rebut this testimony. As a result, the sole concern raised by the guardian ad litem was unsubstantiated by the evidence. *Page 11 
 {¶ 22} The trial court did not abuse its discretion in denying Father's motion to change custody. Father's first assignment of error lacks merit.
 Assignment of Error Number Two "THE TRIAL COURT'S ORDER DENYING THE PLAINTIFF/APPELLANT'S MOTION TO BE RELIEVED FROM HIS OBLIGATION TO COVER THE CHILD ON HIS HEALTH INSURANCE WAS AN ABUSE OF DISCRETION[.]"
 {¶ 23} In his second assignment of error, Father contends that the trial court erred when it refused to modify his obligation to provide health insurance for T.M. We disagree.
 {¶ 24} A trial court is vested with broad discretion to decide matters regarding the allocation of parental responsibilities for the care of minor children. Donovan v. Donovan (1996), 110 Ohio App.3d 615, 618. Therefore, a trial court's decision regarding these issues is subject to reversal only upon a showing of an abuse of discretion. Id. An abuse of discretion suggests more than an error of law or judgment.Blakemore, 5 Ohio St.3d at 219. It implies that the attitude of the trial court was unreasonable, arbitrary, or unconscionable. Id.
 {¶ 25} At the hearing before the magistrate, Father introduced evidence of the cost of insurance through his employer. At the time of the hearing, Father paid for health insurance through his employer at a cost of $72.44 per month. To add T.M. to his coverage would raise that cost to $159.50 per month. Thus, to provide health insurance for T.M. for an entire year, Father would pay $1,044.72. Alternatively, Father's employer offered another insurance plan that would cost *Page 12 
only $142.00 per month for Father and T.M. This would result in a yearly cost to insure T.M. of only $834.72 or only $69.56 per month.
 {¶ 26} During the hearing below, Father indicated that an alternative to private insurance could be available for T.M. Specifically, Father testified that he believed that a means tested program called Healthy Start should be available for T.M. However, Father's counsel conceded below that such a program was only available if Father could not obtain other insurance at a reasonable cost.
 {¶ 27} Based upon our review, we cannot say that the trial court acted unreasonably or arbitrarily. After hearing Father's testimony about his other obligations, including child support payments, the trial court concluded that the cost of insuring T.M. was reasonable. Given the fact that Father could insure T.M. for less than $70 per month, we find no error in this determination. Father's second assignment of error lacks merit.
 III {¶ 28} Father's assignments of error are overruled. The judgment of the Wayne County Court of Common Pleas is affirmed.
Judgment affirmed.
 The Court finds that there were reasonable grounds for this appeal. *Page 13 
We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Wayne, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.
Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(E). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.
Costs taxed to Appellant.
 CARR, P. J., DICKINSON, J., CONCUR. *Page 1