[Cite as *Walsh-Stewart v. Stewart*, 2012-Ohio-5927.]

| | | |
|---|---|---|
| STATE OF OHIO | ) | IN THE COURT OF APPEALS |
| | )ss: | NINTH JUDICIAL DISTRICT |
| COUNTY OF WAYNE | ) | |

MICHELLE L. WALSH-STEWART

    Appellant

    v.

STEPHEN G. STEWART

    Appellee

C.A. No.     12CA0031

APPEAL FROM JUDGMENT
ENTERED IN THE
COURT OF COMMON PLEAS
COUNTY OF WAYNE, OHIO
CASE No.     03-DR-0415

DECISION AND JOURNAL ENTRY

Dated: December 17, 2012

CARR, Judge,

{¶1} Plaintiff-Appellant, Michelle Walsh-Stewart ("Mother"), appeals from the judgment of the Wayne County Court of Common Pleas, Domestic Relations Division. This Court affirms.

I.

{¶2} Mother and Defendant-Appellee, Stephen Stewart ("Father"), were married in 1997 and had two sons during the course of their marriage: M.S., born in 1998, and T.S., born in 2000. Mother filed a complaint for divorce in 2003, and Father filed a counterclaim for the same. The parties were divorced by way of a separation agreement on December 9, 2003. The agreement provided that Mother would be the residential parent of both children and that Father would have reasonable parenting time with the children. Specifically, the agreement guaranteed Father the minimum parenting time allowed by Local Rule, permitted him to pick up his children from the babysitter any weekday that Wife worked past 3:00 p.m., and allowed the parties to add

additional periods of parenting time. The parties abided by their separation agreement for several years.

{¶3} In October 2010, Father filed a motion for the reallocation of parental rights and responsibilities, asking the court to designate him as the primary residential parent for M.S. and T.S. The court set the matter for a hearing before a magistrate. Meanwhile, Mother filed a motion for contempt, arguing that Father had violated the parties' separation agreement by failing to pay his half of the out-of-pocket medical expenses for the children. The magistrate heard evidence on both issues at the hearing.

{¶4} On December 1, 2011, the magistrate issued his decision. The magistrate recommended that the court grant Father's motion to reallocate the parties' parental rights, but deny Mother's motion for contempt. The trial court adopted the decision the same day. Mother then filed objections to the magistrate's decision, one of which was that the magistrate failed to find that a change of circumstances had occurred. The trial court considered the objections and remanded the matter to the magistrate for more specific findings on both the change of circumstances and best interests prongs of R.C. 3109.04(E)(1)(a).

{¶5} After the court remanded the matter, both parties filed proposed findings for the magistrate. The magistrate issued his decision on March 26, 2012. Subsequently, the trial court overruled Mother's objections with the exception of one objection that is not at issue on appeal. The court named Father the residential parent of M.S. and T.S. and denied Mother's motion to hold Father in contempt.

{¶6} Mother now appeals from the trial court's judgment and raises three assignments of error for our review.

II.

## ASSIGNMENT OF ERROR I

THE TRIAL COURT ERRED AS A MATTER OF LAW BY CHANGING CUSTODY AND THEREBY DESIGNATING DEFENDANT AS SOLE RESIDENTIAL PARENT OF THE PARTIES' MINOR CHILDREN IN THE ABSENCE OF A CHANGE OF CIRCUMSTANCES SUPPORTED BY THE EVIDENCE AT TRIAL, OR ALTERNATIVELY SOLELY UPON THE CHILDREN'S STATEMENTS WHICH ARE WITHHELD FROM THE PERVIEW (sic) OF THE PARENTS AND THEIR COUNSEL.

{¶7} In her first assignment of error, Mother argues that the trial court erred by granting Father's motion to reallocate because Father failed to demonstrate that a change of circumstances had occurred since the original allocation of the parties' parental rights. We do not agree that the court erred by finding a change in circumstances.

{¶8} This Court generally reviews a trial court's action with respect to a magistrate's decision for an abuse of discretion. *Fields v. Cloyd*, 9th Dist. No. 24150, 2008-Ohio-5232, ¶ 9. "In so doing, we consider the trial court's action with reference to the nature of the underlying matter." *Tabatabai v. Tabatabai*, 9th Dist. No. 08CA0049-M, 2009-Ohio-3139, ¶ 18. Trial courts have broad discretion in their allocation of parental rights and responsibilities. *Graves v. Graves*, 9th Dist. No. 3242-M, 2002-Ohio-3740, ¶ 31, citing *Miller v. Miller*, 37 Ohio St.3d 71, 74 (1988). "[A] trial court's determination in custody matters 'should be accorded the utmost respect' because '[t]he knowledge a trial court gains through observing the witnesses and the parties in a custody proceeding cannot be conveyed to a reviewing court by a printed record.'" *Baxter v. Baxter*, 9th Dist. No. 10CA009927, 2011-Ohio-4034, ¶ 6, quoting *Miller* at 74. Accordingly, "[c]ustody determinations will not be reversed on appeal absent an abuse of discretion." *Baxter* at ¶ 6. An abuse of discretion implies that "the court's attitude is unreasonable, arbitrary or unconscionable." *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219

(1983). If, however, a litigant challenges a particular factual finding of the trial court, this Court will review the trial court's factual conclusion for competent, credible evidence. *Maxwell v. Maxwell*, 9th Dist. No. 07CA0047, 2008-Ohio-1324, ¶ 6. A determination of "whether a change in circumstances has occurred so as to warrant a change in custody" is one that must be reviewed under an abuse of discretion standard. *Davis v. Flickinger*, 77 Ohio St.3d 415 (1997), paragraphs one and two of the syllabus.

{¶9} A court cannot:

> modify a prior decree allocating parental rights and responsibilities for the care of children unless it finds, based on facts that have arisen since the prior decree or that were unknown to the court at the time of the prior decree, that a change has occurred in the circumstances of the child, the child's residential parent, or either of the parents subject to a shared parenting decree, and that the modification is necessary to serve the best interest of the child.

R.C. 3109.04(E)(1)(a). As such, "before a modification can be made pursuant to R.C. 3109.04(E)(1)(a), the trial court must make a threshold determination that a change in circumstances has occurred." (Internal citations omitted.) *Buttolph v. Buttolph*, 9th Dist. No. 09CA0003, 2009-Ohio-6909, ¶ 11, quoting *Gunderman v. Gunderman*, 9th Dist. No. 08CA0067-M, 2009-Ohio-3787, ¶ 9 . Moreover, the requisite change of circumstances "must be a change of substance, not a slight or inconsequential change." *Davis* at 418.

{¶10} Mother and Father never had a shared parenting plan, so no shared parenting decree exists in this case. For there to have been a change in circumstances, therefore, a change must have occurred either in the circumstances of the children or Mother, the residential parent. *See* R.C. 3109.04(E)(1)(a). Mother argues that Father failed to demonstrate a change in circumstances because her circumstances have hardly changed since 2003. Mother notes that she remains unmarried, lives in a similar home, and maintains virtually the same job that she had in 2003. As for the children, Mother notes that they are still in the same school system. Mother

acknowledges that both M.S. and T.S. want to live with Father, but argues that the boys have always expressed a preference to live with Father. Accordingly, Mother argues that nothing has changed since the original allocation of the parties' parental rights.

{¶11} In finding that a change of circumstances had occurred, the trial court largely focused on the circumstances of the children. At the time of the parties' divorce, M.S. was five years old and T.S. was three years old. By the time of the hearing on Father's motion to reallocate, M.S. was thirteen and T.S. was eleven. There was extensive testimony presented about the children at the hearing, as well as reports submitted by Dr. Marianne Bowden, a psychologist the court appointed to evaluate each member of the parties' family, and Denise Estill, the children's guardian ad litem. All of the non-family members who presented evidence to the trial court expressed serious concerns about M.S. and T.S.

{¶12} Dr. Bowden diagnosed both M.S. and T.S. after she performed her evaluation. Specifically, she diagnosed M.S. with adjustment disorder with mixed anxiety and depressed mood while she diagnosed T.S. with oppositional defiant disorder and attention-deficit/hyperactivity disorder, combined type. Dr. Bowden wrote in her evaluation that constant conflict between Mother and Father had caused both M.S. and T.S. to take on a problem-solving role between their parents. Both children expressed to Dr. Bowden that their parents were unable to get along, frequently argued, and were negative towards one another.

{¶13} Dr. Bowden testified to the "intense conflict" between Mother and Father and noted that it had caused the children to be "caught in the middle." At the time of the hearing, T.S. had been in individual counseling for a period of six years. Dr. Bowden testified that T.S. continued to have behavioral problems and agreed that it was of concern that he had not yet improved after six years of therapy. Dr. Bowden further agreed that if things did not change for

T.S. he would have "serious life[-]long issues." Additionally, Dr. Bowden testified that all the problems between Mother and Father and with T.S. were negatively affecting M.S.

{¶14} Estill, the children's guardian ad litem, wrote in one of her reports to the court that Mother and Father had "extreme difficulty communicating with each other," and that M.S. and T.S. were well aware that their parents had a "bad" relationship. Estill also described the ongoing difficulties that Mother had with T.S., including at least one instance where he told his Mother that he hated her and that Father was a better parent. Estill wrote that T.S. frequently would use "tantrums and inappropriate behaviors to his advantage to get what he want[ed]."

{¶15} Ken Gibson testified that he has been counseling T.S. several times per month since November 2010. Gibson described T.S. as "one of [the] most openly defiant children [he has] ever had in [his] practice." As part of his treatment, Gibson referred T.S. to a psychiatrist so that he could be prescribed medication. Gibson noted that T.S. "plays one side against the other" in terms of his parents and has more of an attitude problem in his interactions with Mother.

{¶16} A change in circumstances may include "a breakdown in communication between the parents and their inability to communicate and cooperate." *Sypherd v. Sypherd*, 9th Dist. No. 25815, 2012-Ohio-2615, ¶ 20. Both Mother and Father acknowledged that they are unable to communicate with each other. According to Mother, the parties were able to communicate with one another fairly well after they divorced, but things changed once Father remarried. Regardless, both described instances where important information one parent learned about the children was not conveyed to the other. There also was significant evidence that the children were suffering due to the ongoing conflict between the parties. *See id.* at ¶ 20-28 (change in circumstances established where evidence showed ongoing conflict between parents that was causing the children anxiety). Both M.S. and T.S. warranted diagnoses at the time of their

psychological evaluations, and Dr. Bowden testified that T.S. would have "serious life[-]long issues" if things did not change.

{¶17} This Court has recognized that "a change in the child's age, coupled with his expressed desire to live with a different parent might constitute the requisite change of circumstances in certain cases * * *." *Pryor v. Hooks*, 9th Dist. No. 25294, 2010-Ohio-6130, ¶ 10. Both M.S. and T.S. were significantly older at the time of the reallocation hearing than they were at the time the divorce. Moreover, both boys were adamant that they wished to live with Father. In their conversations with Dr. Bowden and their guardian ad litem, the boys expressed that they got along better with Father and that it was easier for them to work out any problems that arose with Father. The boys also indicated that they got along better with Melissa Stewart, their step-mother, than with Mother's boyfriend and his four children. Finally, both M.S. and T.S. stated that at this point in their lives as young men they would feel more comfortable living with Father.

{¶18} After a thorough review of the record, we cannot conclude that the trial court abused its discretion by finding that a change of circumstances had occurred since the parties' divorce in 2003. The evidence established ongoing animosity between the parties as well as a complete failure to communicate. It further established that M.S. and T.S. were suffering a great deal as a result of the conflict, such that a change was necessary. M.S. and T.S. had aged eight years since the parties' divorce, and both expressed a strong desire to live with Father for a variety of reasons. In light of all of the foregoing circumstances, the trial court acted within its sound discretion in concluding that a change of circumstances had occurred. Consequently, Mother's first assignment of error is overruled.

## ASSIGNMENT OF ERROR II

THE TRIAL COURT'S ORDER IS NOT IN THE BEST INTERESTS OF THE MINOR CHILD[REN] OF THE PARTIES AND IS IN OPPOSITION TO THE MANIFEST WEIGHT OF THE EVIDENCE PRESENTED AT TRIAL.

{¶19} In her second assignment of error, Mother argues that the trial court erred by granting Father's motion to reallocate because reallocation is not in the best interests of M.S. and T.S. We do not agree.

{¶20} As previously set forth, we review a trial court's action with respect to a magistrate's decision "with reference to the nature of the underlying matter." *Tabatabai*, 2009-Ohio-3139, at ¶ 18. "[F]or a reviewing court to overturn a trial court's determination of custody, the appellate court must find that the trial court abused its discretion." *Taylor v. Taylor*, 9th Dist. No. 11CA010071, 2012-Ohio-4097, ¶ 9, quoting *Masters v. Masters*, 69 Ohio St.3d 83, 85 (1994). Thus, absent an argument that the trial court reached an incorrect factual determination on one or more of the best interest prongs, this Court will review a trial court's best interest analysis under an abuse of discretion standard of review. *See, e.g., Oberlin v. Oberlin*, 9th Dist. No. 25864, 2011-Ohio-6245, ¶ 7, 16-22; *Maxwell*, 2008-Ohio-1324, at ¶ 6-8. An abuse of discretion implies that "the court's attitude is unreasonable, arbitrary or unconscionable." *Blakemore*, 5 Ohio St.3d at 219.

{¶21} R.C. 3109.04(F)(1) governs best interest determinations with regard to the reallocation of parental rights and responsibilities. In determining what is in a child's best interest:

the court shall consider all relevant factors, including, but not limited to:

(a) The wishes of the child's parents regarding the child's care;

(b) If the court has interviewed the child in chambers pursuant to division (B) of this section regarding the child's wishes and concerns as to the allocation of

parental rights and responsibilities concerning the child, the wishes and concerns of the child, as expressed to the court;

(c) The child's interaction and interrelationship with the child's parents, siblings, and any other person who may significantly affect the child's best interest;

(d) The child's adjustment to the child's home, school, and community;

(e) The mental and physical health of all persons involved in the situation;

(f) The parent more likely to honor and facilitate court-approved parenting time rights or visitation and companionship rights;

(g) Whether either parent has failed to make all child support payments * * *.

R.C. 3109.04(F)(1)(a)-(g). Mother does not argue that the trial court reached an incorrect factual finding on any particular best-interest prong. Instead, she argues that the court's ultimate decision was wrong because reallocation was not in her children's best interests. Because Mother's argument actually challenges the court's ultimate custody determination, we must review it under an abuse of discretion standard of review. *See Taylor*, 2012-Ohio-4097, at ¶ 9, quoting *Masters*, 69 Ohio St.3d at 85. As such, this Court only may reverse the custody determination of the trial court if we conclude that the court's decision was "unreasonable, arbitrary or unconscionable." *Blakemore* at 219.

{¶22} After she conducted her psychological evaluations, Dr. Bowden concluded that Mother, Father, and Melissa Stewart, the children's step-mother, all had appropriate parenting skills, but struggled to work together for the benefit of the children. Neither Dr. Bowden nor the guardian ad litem would make a custody recommendation due to the high-level of conflict between the parties and the specific circumstances involved. In particular, Dr. Bowden feared recommending a change in custody because the children viewed the change as a solution and, if the children had the same problems in Father's care due to the ongoing conflict between their

parents, they might experience an even greater sense of despondency. Accordingly, there was no custody recommendation in favor of either Mother or Father.

{¶23} With regard to parenting styles, Dr. Bowden wrote in her evaluation that Mother tended to be obsessive-compulsive and parented with a focus on small details while Father had a more dependent personality and parented "with a strong need to be accepted." Although Dr. Bowden believed that the boys had structure at both of their parents' houses, she testified that there was more structure at Mother's house. Dr. Bowden agreed at the hearing that Father was more likely to "pick his battles" with T.S. and not require rigid compliance from him in any given scenario. Dr. Bowden further agreed that a child with T.S.'s diagnosis would benefit from a scenario in which a caretaker would pick his or her battles and not demand detailed compliance. Dr. Bowden acknowledged that Mother had ongoing and serious issues in her personal relationship with T.S. and that those issues had an impact on M.S. as well. She opined that, if things did not change, T.S. would have "serious life[-]long issues."

{¶24} At the time of the hearing, both Mother and Father had been involved in relationships with their significant others for a number of years. Father married Melissa in 2008, and Mother began a relationship with Tim Smith around the same time. Both Melissa and Tim had significant contact with M.S. and T.S., as Melissa was with the boys each time they came to Father's house and Mother saw Tim three to four times a week when the boys were with her. Melissa participated in the psychological evaluation that Dr. Bowden conducted and was diagnosed with histrionic personality disorder with narcissistic features. Dr. Bowden explained that Melissa tended to react with intense emotion and that her responses likely created more communication difficulties for Mother and Father. Since Dr. Bowden's evaluation, however, both Melissa and Father had followed her recommendation and had begun individual therapy to

address the issues she identified. Moreover, when they spoke to Dr. Bowden and their guardian ad litem, M.S. and T.S. stated that they enjoyed Melissa's company and got along with her well. Neither of the boys indicated that they enjoyed being with Tim, Mother's boyfriend. T.S. in particular informed Dr. Bowden that he did not like Tim. Tim testified at the reallocation hearing and admitted that he became physical with T.S. on more than one occasion when he felt that T.S. had gotten out of control. Tim admitted that he had tackled T.S. once when running after him, had pushed him up to a wall and held him there, and might have threatened to slap T.S. across the face on more than one occasion when T.S. used inappropriate language. There was also testimony that T.S. had difficulty with one of Tim's four children on at least one occasion when the two were engaged in horseplay.

{¶25} Mother testified at the hearing that Father was not involved with their sons' schooling or therapy and refused to communicate with her when it came to the children. She admitted, however, that she was unaware if Father had independently contacted the school without her knowledge. She further admitted that she had informed T.S.'s psychiatrist that she did not want any of T.S.'s information shared with Father's wife Melissa and that she wanted to be present if information was to be conveyed to Father. Further, Ken Gibson, T.S.'s therapist, testified that it would be difficult for him to incorporate Father into T.S.'s therapy because he "ha[d] a bias already" from working with Mother and T.S. Gibson also admitted that he required Mother to give him authorization before he would even speak with Father and that his office had turned Father away on one occasion before Mother had approved the release. Although Mother eventually signed a release, Gibson testified that it was "probably true" that his office never contacted Father to notify him that Mother had signed the release.

{¶26} Father admitted that he and Mother had difficulty communicating and that he generally refused to take her phone calls, opting instead to allow her calls to go to voicemail. Father later elaborated that he avoided talking to Mother on the phone because it "usually end[ed] up in an argument." He specified that Mother frequently cursed on the phone, used offensive language, and said belittling things to him. Further, M.S. and T.S. had clearly witnessed their parents fighting many times, as both described the fighting and their parents' inability to get along for Dr. Bowden and the guardian ad litem. While Mother repeatedly pointed to Father's inability to communicate, Dr. Bowden opined that all of the parties needed to learn to communicate more effectively.

{¶27} Father testified that he independently contacted his children's school when issues arose and that he had attempted to become involved with their therapy, albeit without success. Father admitted that he did not think that medication was the right choice to treat T.S.'s difficulties and that he failed to notify Mother or take any action when he learned at one point that T.S. had stopped taking his medication. Father further testified that, if the choice was his, T.S. would not take medication. Father reported that he did not have the same behavioral problems with T.S. that Mother had and that he generally could resolve any issue that arose simply by sitting T.S. down and talking to him. Even so, Father agreed that he would take his children to counseling and follow any recommendations of the therapist and/or psychiatrist if the court ordered him to do so. Father also testified that he had started individual counseling since Dr. Bowden's evaluation and was finding it helpful.

{¶28} As previously discussed, M.S. and T.S. each expressed a strong desire to live with Father. Father lived in the same school district as Mother, so the boys would remain in the same school under either Father or Mother's care. There was also testimony that Father lived on a

farm, and the boys enjoyed being there and helping with farm chores. M.S. in particular was interested in becoming a veterinarian who worked with large animals, so he enjoyed being around the large animals on the farm. Moreover, apart from Melissa, Father testified that his mother lived next door and was willing to help with the boys if they lived there.

{¶29} Neither Mother and Father nor the boys were in favor of simply changing to a more equal parenting schedule, such as a week-on/week-off arrangement. Instead, everyone wanted one parent to have custody with the other having mid-week visitation and visitation every other weekend. *See* R.C. 3109.04(F)(1)(a). Based on our review of the record, we must conclude that the trial court acted within its sound discretion by finding that a change of custody was in the boys' best interest. Both M.S. and T.S. were adamant that they wanted to live with Father and both were struggling with their mental health at the time of the hearing. *See* R.C. 3109.04(F)(1)(b), (e). There was testimony that M.S. and T.S. acted more manageably in their Father's care while they frequently argued with Mother. *See* R.C. 3109.04(F)(1)(c). There also was testimony that the boys had a better relationship with their step-mother Melissa than with Mother's boyfriend. *Id.* Having thoroughly reviewed the entire record, we cannot conclude that the court's custody determination was "unreasonable, arbitrary or unconscionable." *Blakemore*, 5 Ohio St.3d at 219. Therefore, the trial court did not abuse its discretion by granting Father's motion to reallocate. Mother's second assignment of error is overruled.

## **ASSIGNMENT OF ERROR III**

THE TRIAL COURT ABUSED ITS DISCRETION BY FAILING TO FIND THE DEFENDANT IN CONTEMPT FOR HIS REFUSAL AND FAILURE TO PAY HIS COURT ORDERED SHARE OF THE UNINSURED MEDICAL EXPENSES FOR THE CHILDREN, INCLUDING, BUT NOT LIMITED TO, THE CHILDREN'S ORTHODONTIC TREATMENTS.

{¶30} In her third assignment of error, Mother argues that the court abused its discretion by failing to find Father in contempt for refusing to pay the out-of-pocket medical expenses for the children. We disagree.

{¶31} "This Court reviews contempt proceedings for an abuse of discretion." *Morrow v. Becker*, 9th Dist. No. 11CA0066-M, 2012-Ohio-3875, ¶ 47. *See also Tabatabai*, 2009-Ohio-3139, at ¶ 18 (trial court's action on magistrate's decision reviewed "with reference to the nature of the underlying matter"). An abuse of discretion implies that "the court's attitude is unreasonable, arbitrary or unconscionable." *Blakemore* at 219.

{¶32} "In civil contempt proceedings, a finding of contempt must be premised on clear and convincing evidence." *Zemla v. Zemla*, 9th Dist. No. 11CA0010, 2012-Ohio-2829, ¶ 11. The party seeking to hold the other in contempt bears the burden of proving the other's failure to comply with an order of the court. *Id.* "Once the movant proves [her] prima facie case, the contemnor must present evidence of [his] inability to comply with the order or any other available defense." *Id.* "[If] contempt proceedings are invoked solely by the person aggrieved by disobedience of the court's order, a refusal to punish for contempt is largely within the discretion of the trial court * * *." *Akin v. Akin*, 9th Dist. Nos. 25524 & 25543, 2011-Ohio-2765, ¶ 44, quoting *Thomarios v. Thomarios*, 9th Dist. No. 14232, 1990 WL 1777, *2 (Jan. 10, 1990).

{¶33} Mother argues that the trial court abused its discretion by failing to hold Father in contempt because Father was aware of numerous out-of-pocket medical expenses for the children, but had failed to pay his portion of them. In refusing to hold Father in contempt, the trial court noted that Father undoubtedly owed a sum of money, including an obligation for "orthodontics phase two" for M.S., but that Father's failure to pay his half of the expenses did not warrant a finding of contempt under the specific facts of this case. Mother acknowledged at

the hearing that she had stopped giving Father copies of the bills back in 2008, claiming that it was because Father was refusing to pay them. Yet, she acknowledged that she had not sought the court's help to recover any of the expenses from Father for several years. For his part, Father testified that he had paid all of the bills Mother had made him aware of with the exception of one orthodontics bill that he did not pay because the two could not agree on their son's treatment. Otherwise, Father testified that he only received explanation of benefits forms from his insurance company, not bills for any of the amounts actually due and owing.

{¶34} The trial court determined that Father's failure to pay stemmed not from willful disobedience, but from the parties' inability to communicate with one another. Neither party contacted the other to determine what bills needed to be split. Instead, Mother stopped giving Father copies of the bills, started paying them all herself, and only sought to hold Father in contempt after Father filed his motion to reallocate. While the court acknowledged that Father clearly owed money, the court exercised its discretion and declined to hold Father in contempt. Instead, the court ordered the parties to "cooperate in determining [the] complete details of all expenses [and] to arrive at an amount due from [Father]."

{¶35} Given the foregoing circumstances and the facts unique to this case, we cannot conclude that the trial court abused its discretion by refusing to hold Father in contempt and by instead ordering the parties to cooperate in order to resolve the issue on their own. *See Akin*, 2011-Ohio-2765, at ¶ 44, quoting *Thomarios*, 1990 WL 1777, at *2. Mother's third assignment of error is overruled.

### III.

{¶36} Mother's assignments of error are overruled. The judgment of the Wayne County Court of Common Pleas, Domestic Relations Division, is affirmed.

Judgment affirmed.

———

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Wayne, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(C). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed to Appellant.

DONNA J. CARR
FOR THE COURT

WHITMORE, P. J.
DICKINSON, J.
CONCUR.


APPEARANCES:

RENEE J. JACKWOOD, Attorney at Law, for Appellant.

LON R. VINION, Attorney at Law, for Appellee.

DENISE ESTILL, Guardian ad litem.